UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -x

```
┌─────────────────────────────┐
│ USDC SDNY                   │
│ DOCUMENT                    │
│ ELECTRONICALLY FILED        │
│ DOC #: _____            │
│ DATE FILED: 8/14/07         │
└─────────────────────────────┘
```

JOSEPH F. DESANTIS,                    :

              Plaintiff,              :

                          :  **MEMORANDUM DECISION**

        - against -
                         :  05 Civ. 10868 (DC)

DEUTSCHE BANK TRUST COMPANY
AMERICAS, INC., DEUTSCHE BANK          :
AMERICAS HOLDING CORP., and
DEUTSCHE BANK AG NEW YORK,             :

              Defendants.             :

- - - - - - - - - - - - - - - - - - -x

**APPEARANCES:**   DANIEL P. LEVITT, ESQ.
                Attorney for Plaintiff
                551 Fifth Avenue, Suite 1922
                New York, New York  10176

                SIDLEY AUSTIN LLP
                Attorneys for Defendants
                    By:  Nicholas H. De Baun, Esq.
                         Karen M. Carbone, Esq.
                787 Seventh Avenue
                New York, New York  10019

**CHIN, D.J.**

            Plaintiff Joseph D. DeSantis was a managing director at
defendant Deutsche Bank Trust Company Americas, Inc. ("Deutsche
Bank" or the "Bank") from October 2000 through January 2005, when
his position was eliminated as a result of a corporate
restructuring.  DeSantis now sues Deutsche Bank (and its
affiliated companies) to recover severance and bonus payments to
which he claims he is entitled.  Defendants move for summary
judgment.  For the reasons stated below, the motion is granted in
part and denied in part.

**BACKGROUND**

**A.    The Facts**

In October 2000, DeSantis began working for Scudder Kemper Investments ("Scudder") as a managing director.  (Defs.' 56.1 ¶ 2).[1]  In September 2001, Scudder was acquired by Deutsche Bank.  (Id. ¶ 3).  DeSantis thereafter became an employee of Deutsche Bank, continuing in his role as a managing director in the Equities Group.  (Id.).  DeSantis's employment with both Scudder and the Bank was at-will.  (DeSantis Dep. 27-29, 32, 39).

**1.    The Bank's Bonus Policy**

As a Deutsche Bank employee, DeSantis was eligible to receive incentive compensation, or a bonus, as part of his total compensation.  (See Defs.' 56.1 ¶ 6; Lombardo Aff. ¶ 3).  As set forth in the HR Policies contained in the Deutsche Bank Handbook ("HR Policies"), bonuses were given at the Bank's discretion:

> Our Total Compensation package, which may be composed of base pay and incentive compensation, is the primary focus for compensation decisions. . . . Decisions on Total Compensation are at the complete discretion of the Bank.  There is no guarantee of cash or equity bonuses, merit increases, or any other pay items unless the employee has a written agreement with the Bank that states otherwise.

(HR Policies at 16).  DeSantis had no such written agreement with the Bank.  (DeSantis Dep. 44).  The HR Policies further stated,

---

[1]    Where one party's 56.1 Statement is cited, the other side has not disputed the facts alleged, unless otherwise indicated.

in relevant part:

> Incentive compensation comprises cash bonus
> and, in some cases, other elements of equity-
> based non-cash compensation.  Incentive
> compensation is discretionary and designed to
> reward employees for their individual
> performance, the performance of their
> division, and the overall financial success
> of Deutsche Bank.
>
> All employees are eligible to receive a
> discretionary cash bonus.  To receive a
> bonus, you must be employed with Deutsche
> Bank on the day the bonus is paid out.

(HR Policies at 16).

Bonuses for any given year were usually paid in February of the following year.  (Lombardo Aff. ¶ 3).  For 2003,[2] DeSantis received a bonus of $1,000,000.  (DeSantis Aff. ¶ 11). Bonuses for 2004 were paid on February 14, 2005.  (Id.).

## 2.  __DeSantis's Termination and Proposed Severance Package__

On December 17, 2004, DeSantis was informed that as a result of a corporate restructuring, his position would be eliminated and his employment with the Bank would be terminated. (DeSantis Dep. 67).  At the Bank's request, DeSantis agreed to continue in his role until January 28, 2005.  (Id. at 74).  In connection with the termination of his employment, the Bank provided DeSantis with a letter, dated December 17, 2004, offering him a severance package in exchange for a general release of claims against the Bank (the "Severance Letter" (Compl. Ex. 1)).  (Defs.' 56.1 ¶ 13).  The Severance Letter

---

[2]     References to years for which the Bank paid bonuses are to calendar years.

stated that the severance offer expired on January 7, 2005, and that for a period of seven days after signing the Severance Letter DeSantis could revoke it.  (Severance Letter at 5).  The Severance Letter further stated: "You understand and agree that the severance payment fulfills any and all of Deutsche Bank's obligations to you under your employment letter, and any bonus, incentive compensation, severance or separation plan or allowance due to you from or maintained by Deutsche Bank."  (Id. at 2).

The proposed severance package was computed in accordance with the Bank's Severance Pay Plan, effective January 18, 2002 and amended as of December 9, 2004 (the "Plan").  (Whitaker Aff. Ex. A; Defs.' 56.1 ¶ 13).  The Plan is administered by the Bank, which delegated responsibility for the day-to-day administration of the Plan to an oversight committee (the "Oversight Committee" or "Committee").  (Plan at 5 § 7).  The Plan states in pertinent part that:

> The [Bank] and the Oversight Committee shall have the discretionary authority and responsibility to determine eligibility for benefits and the amount of such benefits, and to construe the terms of the Plan.  The determinations and constructions of the [Bank] or the Oversight Committee, as the case may be, will be final, binding and conclusive as to all parties, unless found by a court of competent jurisdiction to be arbitrary and capricious.  Benefits under this Plan shall be paid only if the [Bank] as Plan Administrator, or the Oversight Committee acting on behalf of the [Bank], decides in its sole discretion that the applicant is entitled to them.

(Id. at 6 § 7).

- 4 -

Under the Plan, certain Bank employees whose employment is involuntarily terminated are eligible for severance benefits, provided that such employee:

> (i)  remains in his or her position in good standing until the last day of employment on the active payroll of the Bank ("Termination Date") designated by the Bank, in its sole discretion; and

> (ii) reconciles his/her expense account, returns any financial advances and Bank property, and repays any personal loans on or before his/her Termination Date; and

> (iii)  signs a Release Agreement in the form and within the time required by the Bank and does not revoke it within any deadlines provided by the Bank.

(Id. at 1 § 2).  There is no dispute that DeSantis was a participant in the Plan and was eligible for benefits thereunder. (See Tr. 11).[3]

Plan participants are eligible to receive two types of severance benefits.  First, they may receive severance pay equivalent to 3 weeks' salary for each year of service, with a minimum of 12 weeks' salary and, for those participants whose termination date -- defined as the employee's "last day of employment on the active payroll of the Bank" (Plan at 1) -- was on or after April 25, 2002, a maximum of 52 weeks' salary.  (Plan Appendix at 1 § 1.a).  Second, the Plan further provides that the Oversight Committee has the sole direction to make a Special Incremental Severance Payment ("Special Payment") to employees

_____

[3]  References to "Tr." are to the transcript of oral argument on July 10, 2007.

whose termination date is on or after June 25, 2002 under certain
circumstances, computed in accordance with the following "75%-50%
formula" set forth in § 1.b:

> A Plan Participant whose Termination Date is
> on or after April 1 of the calendar year in
> which the termination date occurs, but before
> the date Incentive Compensation is next paid
> . . . will be considered by the Oversight
> Committee in its sole discretion for a
> Special Payment that may be up to an amount
> equal to the following: (i) up to 75% of the
> first $130,000 of the Incentive Compensation
> most recently paid to the Plan Participant,
> if any; plus (ii) up to 50% of the Incentive
> Compensation most recently paid to the Plan
> Participant that is in excess of $130,000, if
> any.

(Id. at 1 § 1.b).  Plan participants whose termination date falls
on or after the date bonuses are paid, but before April 1 of that
calendar year are not eligible for a Special Payment.  (Id. at 2
§ 1.b).

     The severance payment offered to DeSantis consisted of:
(1) a lump-sum payment of $46,153.85, representing 8 weeks of
DeSantis's base salary and payable within 30 days of his
separation date of January 28, 2005; and (2) an additional
$555,576.92 payable upon the later of (i) DeSantis's separation
date, and (ii) receipt of his signed copy of the Severance Letter
and expiration of the 7-day revocation period.  (Defs.' 56.1 ¶
15; Severance Letter at 1-2).  The second amount represented 4
weeks of DeSantis's base salary, plus a Special Payment of
$532,500, calculated in accordance with § 1.b of the Plan.
(Defs.' 56.1 ¶¶ 15, 16).  The Special Payment offered to DeSantis
was the maximum amount permitted under § 1.b.  (Id. ¶ 18).

- 6 -

According to the Bank, these amounts represented 3 weeks' salary for each year of service (a total of 12 weeks for 4 years of service) and a Special Payment calculated using the 75%-50% formula.  (See Compl. Ex. 5).

On January 6, 2005, DeSantis sent a letter to the Oversight Committee requesting review of the severance package. (Id. Ex. 2).  In the letter he challenged, among other things, the application of the 75%-50% formula to the Special Payment offered in the Severance Letter.  (Id. at 1).  By letter dated March 21, 2005, the Oversight Committee responded, stating that his severance pay and Special Payment were correctly calculated in accordance with the Plan and declining to exercise its discretion to offer him additional compensation.  (Compl. Ex. 3). By letter dated April 15, 2005, DeSantis appealed the Committee's decision.  (Compl. Ex. 4).  The Committee denied his appeal by letter dated June 13, 2005.  (Compl. Ex. 5).  That letter also advised DeSantis that he had no further right to appeal under the Plan and that he was entitled to bring a court action concerning his claims pursuant to § 502(a) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq.  (Id. at 2).

The Bank paid DeSantis severance amounting to 8 weeks' salary, but because DeSantis never executed the Severance Letter, he did not receive any other compensation in connection with his discharge.  (Defs.' 56.1 ¶ 22; Pl.'s Opp. at 3 n.1).

**B.    Procedural History**

On December 30, 2005, DeSantis filed the complaint in this action, challenging the Bank's proposed severance package. He asserts claims for violations of ERISA, breach of an implied contract, and quantum meruit.  He claims that he is entitled to receive at least $1,120,000 -- an amount he alleges is consistent with the bonuses paid to his subordinates for 2004, which averaged 112% of the bonuses paid for 2003 -- plus interest, for working all of 2004 and a portion of 2005.  With respect to his ERISA claim, DeSantis argues that the Bank wrongfully limited the Special Payment offered as part of his severance package by applying the 75%-50% formula set forth in the Plan.  As alternative theories, he argues that he is entitled to a bonus for 2004 under an implied contract or quantum meruit.  DeSantis also seeks $23,076.92, representing 4 weeks of salary earned during the first January 2005 that was "promised but not paid pending resolution of plaintiff's protest and appeal," plus interest, reasonable attorney's fees, and costs.  (Compl. ¶ 25).

Discovery in this case closed on December 15, 2006, and on January 22, 2007 defendants filed this motion.  On July 10, 2007, the Court heard oral argument on the motion.

Subject matter jurisdiction is based on diversity. DeSantis is a citizen of New Jersey, and defendants are New York citizens.

**DISCUSSION**

**A.   Summary Judgment Standard**

        The standards governing motions for summary judgment
are well-settled.  A court may grant summary judgment only where
there is no genuine issue of material fact and the moving party
is therefore entitled to judgment as a matter of law.  See Fed R.
Civ. P. 56(c); Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
475 U.S. 574, 585-87 (1986).  Accordingly, the court's task is
not to "weigh the evidence and determine the truth of the matter
but to determine whether there is a genuine issue for trial."
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  To
create an issue for trial, there must be sufficient evidence in
the record to support a jury verdict in the nonmoving party's
favor.  See id.

        To defeat a motion for summary judgment, the nonmoving
party "must do more than simply show that there is some
metaphysical doubt as to the material facts."  Matsushita, 475
U.S. at 586.  As the Supreme Court stated in Anderson, "[i]f the
evidence is merely colorable, or is not significantly probative,
summary judgment may be granted."  Anderson, 477 U.S. at 249-50
(citations omitted).  The nonmoving party may not rest upon mere
conclusory allegations or denials, but must set forth "concrete
particulars" showing that a trial is needed.  Nat'l Union Fire
Ins. Co. v. Deloach, 708 F. Supp. 1371, 1379 (S.D.N.Y. 1989)
(quoting R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 77
(2d Cir. 1984) (internal quotations omitted)).  Accordingly, it

- 9 -

is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." BellSouth Telecomms., Inc. v. W.R. Grace & Co., 77 F.3d 603, 615 (2d Cir. 1996) (internal quotations omitted).

**B.   ERISA Claim**

　　　**1.   Applicable Law**

　　　　The parties do not dispute that the Bank's Severance Pay Plan is governed by ERISA.  Although he does not expressly characterize it as such, it appears that DeSantis asserts his first cause of action under § 502(a)(1)(B) of ERISA, which permits a participant of an ERISA employee benefits plan to bring a civil action to recover benefits due under the terms of the Plan.  See 29 U.S.C. § 1132(a)(1)(B); Smith v. Dunham Bush, Inc., 959 F.2d 6, 10 (2d Cir. 1992).  "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Kinstler v. First Reliance Standard Life Ins. Co., 181 F.3d 243, 249 (2d Cir. 1999) (quoting Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989)).  "Where the plan reserves such discretionary authority, denials are subject to the more deferential arbitrary and capricious standard, and may be overturned only if the decision is 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'"  Id. (quoting Pagan v. NYNEX Pension Plan, 52 F.3d 438, 442 (2d Cir. 1995) (citation and

internal quotation marks omitted)).

      "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decision maker and] requires more than a scintilla but less than a preponderance." <u>Armstrong v. Liberty Mut. Life Assur. Co. of Boston</u>, 273 F. Supp. 2d 395, 404 (S.D.N.Y. 2003) (quoting <u>Miller v. United Welfare Fund</u>, 72 F.3d 1066, 1072 (2d Cir. 1995)) (internal quotations omitted).

    **2.**   **Application**

      The parties agree that the arbitrary and capricious standard of review applies in this case, for, as noted earlier, the Plan clearly vests the Bank and the Oversight Committee with discretion to determine eligibility for benefits and to construe the terms of the Plan.

      The issue before the Court is whether the Oversight Committee's decision to apply the 75%-50% formula set forth in § 1.b of the Plan and award DeSantis a Special Payment of $532,500 was arbitrary and capricious.  The resolution of this issue involves factual disputes that precludes a grant of summary judgment.

      The Bank argues that the Committee reasonably exercised its discretion in offering DeSantis "the maximum sum to which he could be entitled under the terms of the [ ] Plan."  (Defs.' Mem. at 11).  The Plan, the Bank claims, contains no provision that entitles DeSantis to any Special Payment or severance pay above what he was offered.  DeSantis responds that the Committee did

- 11 -

not exercise any discretion in determining the amount of his Special Payment, but simply used a spreadsheet to apply the 75%-50% formula to his 2003 bonus.

At the outset, by its own terms § 1.b of the Plan was not applicable to DeSantis.  His "Termination Date" was not "on or after April 1 of the calendar year in which the termination occurs."  Rather, he worked all of 2004 and his employment was not terminated until the next calendar year, on January 28, 2005.  But the issue was what, if any, Special Payment he should have been paid for 2004.

Based on the record, it is unclear whether the Oversight Committee's exercise of its discretion with respect to the amount of DeSantis's Special Payment was reasonable.  There is evidence that the Committee applied the 75%-50% formula without considering whether an employee who, like DeSantis, works a full calendar year, a portion of the following year, and is discharged shortly before bonuses are paid, may qualify for additional compensation under the Plan.  For instance, John Lombardo, the Director of Human Resources at the Bank, testified that the Bank did not make a particularized decision to apply the 75%-50% formula in DeSantis's case; rather, the formula was applied because it was the Bank's "policy."  (Lombardo Dep. 17:9-19).  Bernadette Whitaker, the Bank's Chief Operating Officer of Human Resources and a member of the Oversight Committee, could not recall whether there was any discussion of DeSantis's argument that the 75%-50% formula was inapplicable at the

Committee's meetings held in connection with DeSantis's appeals.
(Whitaker Dep. 31:8-23, 47:13-48:4).  Indeed, she could not
recall the general substance of those meetings.  (Id. at 23:8-11,
47:8-12).

        Thus, DeSantis has produced evidence that the Oversight
Committee did not reasonably exercise its discretion in
determining his Special Payment.  Indeed, a reasonable factfinder
could find that the Oversight Committee did not exercise its
discretion at all, but arbitrarily applied a rule that was on its
face inapplicable.  A reasonable factfinder could further find
that the Oversight Committee acted in an arbitrary and capricious
manner by applying, without any real consideration, a cap
applicable to employees who worked as little as one-fourth of the
year to someone who worked the entire year (and then more).
Because there are triable issues of fact on this issue, summary
judgment is inappropriate on this claim.

        The Bank also argues that DeSantis has waived the right
to any Special Payment because he refused to execute the
Severance Letter within the specified time period.  I reject this
argument.  DeSantis was entitled to challenge his severance
benefits under the Plan and fully complied with the claims and
appeals procedure set forth therein, including bringing this
lawsuit.  He did not waive any rights because he pursued all
available appeals in a timely manner.

Finally, I note that the provision in the HR Policies giving the Bank "complete discretion" to award bonuses does not bar DeSantis's ERISA claim, for he is not seeking a bonus per se. Rather, he contends that he was entitled to severance benefits under an ERISA Plan, which include a Special Payment, and that the Committee acted arbitrarily by limiting his severance benefits based on a purportedly inapplicable rule.

C.   **Implied Contract and Quantum Meruit Claims**

In the alternative, DeSantis alleges that he is entitled to a bonus for 2004, comparable to the bonuses paid to his subordinates for 2004, pursuant to an implied contract and under the doctrine of quantum meruit.  According to DeSantis, the Bank has a "long-established practice and policy . . . of awarding substantial annual bonuses -- typically equal to or larger than annual salaries -- to those employees who work a full calendar year," as is customary in the financial industry. (Compl. ¶ 27).  Having worked all of 2004 and the first four weeks of 2005, DeSantis claims that he is entitled to compensation -- including a substantial bonus -- for those services.  The Bank counters that these claims are preempted by ERISA, for the statute preempts state law claims "relating to" an a covered plan.  I need not address this argument, however, for even if the claims were not preempted by ERISA, they fail as a matter of law.

- 14 -

Under New York law,[4] claims for implied contract and quantum meruit are analyzed together as a quasi-contract claim. See Goll v. First Tennessee Capital Mkts., No. 05 Civ. 7890, 2006 WL 2135801, at *3 (S.D.N.Y. Aug. 1, 2006) (citations omitted). Such a claim only exists, however, only where there is not an express agreement between the parties.  See Valley Juice Ltd., Inc. v. Evian Waters of France, Inc., 87 F.3d 604, 610 (2d. Cir. 1996) ("The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter.") (citation and internal quotations omitted). Furthermore, under both an implied contract and quantum meruit theory, the claimant must have a reasonable expectancy of receiving compensation.  International Paper Co. v. Suwyn, 978 F. Supp. 506, 513 (S.D.N.Y. 1997) (citations omitted).

Here, there is an express provision in the Deutsche Bank Handbook governing the payment of bonuses.  The HR Policies in the Handbook make clear that any payment of bonuses is in the sole discretion of the Bank and that to receive a bonus, an employee must be employed by the Bank on the date bonuses are paid.  DeSantis testified that he understood that to be the Bank's bonus policy.  (DeSantis Dep. 44:19-48:8).  He further acknowledged that he did not have a written agreement with the Bank guaranteeing him a bonus, nor did anyone at the Bank make him any such guarantee.  (Id. at 39:13-20, 44:6-10).  Given the

---

[4]    Both parties apply New York law.

- 15 -

express language of the Bank's bonus policy and DeSantis's lack
of a contractual right to a bonus, DeSantis has not established
an issue of material fact with respect to his quasi-contract
claims.  Accordingly, summary judgment is granted in favor of
defendants on DeSantis's implied contract and quantum meruit
claims.

## CONCLUSION

For the foregoing reasons, defendants' motion for
summary judgment is granted as to all claims except plaintiff's
ERISA claim.  Counsel for the parties shall appear for a pre-
trial conference on August 24, 2007 at 12:30 p.m. in Courtroom
11A.

SO ORDERED.

Dated:    New York, New York
          August 14, 2007

                                         DENNY CHIN
                               United States District Judge

- 16 -